IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

FILED
Nov 14 2026
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

IN THE MATTER OF THE SEARCH OF

APPLE IPHONE WITH BLACK AND BLUE CASE AND CRACKED SCREEN

No. 3:26-sw-155

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH AND SEIZURE WARRANT**

I, Matthew Taylor, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. As explained herein, there is probable cause to believe that criminal violations of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B)(ii)(II) (conspiracy to distribute cocaine and attempted possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine) have been committed by ANGEL EMILIO MARQUEZ (hereinafter, "**MARQUEZ**"), and others.

3. The facts and information contained in this affidavit are based upon my training and experience, personal knowledge, and observations made during the course of this investigation as well as information and evidence obtained from other agents and investigators. All observations that I did not personally make were relayed to me by the individuals who made them, or come from my review of records, documents, and other evidence obtained during this investigation. This affidavit contains information necessary to support probable cause, and it is

not intended to include each and every fact and matter observed by me or known to the government.

**AGENT BACKGROUND**

4. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since May 2005.

5. I attended the sixteen-week DEA basic agent training academy at Quantico, Virginia (VA) beginning on January 24, 2005 and ending on May 13, 2005. While at the DEA training academy, I received instruction on topics like criminal law, the methods and techniques utilized by drug traffickers to avoid detection by law enforcement, illicit drug identification, surveillance techniques, arrest procedures, the safe and effective execution of search warrants, and how to process evidence.

6. I am currently a member of the DEA Richmond District Office Enforcement Group 22. By virtue of my employment as a Special Agent of the DEA, I have performed various tasks, which include, but are not limited to:

a. Functioning as a surveillance agent, thus observing and recording movements of persons trafficking in drugs and those suspected of trafficking in drugs;
b. Interviewing confidential sources and sources of information relative to the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments);

c. Compiling and interpreting information from various data sources to further develop evidence of the communications, associates, locations, timing, and movements involved in the trafficking of illegal drugs;

d. Functioning as a case agent of the current investigation as well as the case agent and co-case agent of many other investigations, which have involved the trafficking of drugs and the laundering of monetary instruments; and

e. Functioning as an affiant in court-authorized Title III investigations.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7. The property to be searched is an Apple iPhone with a black and blue case and cracked screen, hereinafter the "**TARGET DEVICE**." The **TARGET DEVICE** is currently located at 9200 Public Works Road, Chesterfield, VA 23832.

8. The applied-for warrant would authorize the forensic examination of the **TARGET DEVICE** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9. During October 2026, Jaime Andres Muñoz Quiroga ("Muñoz"), a known drug trafficker in Colombia, provided a DEA confidential source ("CS-1")[1] and a Colombian law enforcement officer operating in an undercover capacity ("UC-1") with six kilograms of suspected cocaine. Muñoz was informed those kilograms were bound for Virginia, and CS-1 was directed by investigators to tell Muñoz to label those six kilograms with the numbers "804" (a central Virginia area code), which Muñoz did. Those six kilograms were field-tested, and the tests indicated the presence of cocaine.

10. Muñoz has previously sold and/or facilitated the sale of multiple other kilograms of cocaine to law enforcement officials in Colombia since April 2026, and forensic analysis conducted by the DEA laboratory has confirmed those kilograms consisted of mixtures and substances containing a detectable amount of cocaine. Muñoz believes that the cocaine he

---

[1] CS-1 is a paid confidential source. CS-1 has provided reliable information to the DEA and has helped to arrange, and has participated in, audio-and-video-recorded controlled purchases of narcotics in Colombia.

and his associates have been providing in these transactions was being imported into the United States and being delivered to Virginia and New York.

11. After the October 2026 deal discussed above, Muñoz contacted CS-1 and advised that Muñoz had an individual who was willing to travel to Richmond, Virginia to purchase two kilograms of cocaine for a total of $32,000.00. CS-1 provided Muñoz with the phone number of a DEA special agent who frequently operates in an undercover capacity (hereinafter, "UC-2") and told Muñoz that UC-2 would be in possession of the cocaine from Colombia once it arrived in Virginia.

12. On or about November 2, 2026, UC-2 received a call via WhatsApp from a user with a phone number assigned a 404 (Atlanta area) area code and ending in 4931 (hereinafter, "the 4931 phone number").[2] During the conservation, the caller identified himself as a Dominican truck driver residing in Atlanta, Georgia and said he was willing to travel to Richmond, Virginia. During several recorded phone calls, UC-2 and the caller spoke in coded language to arrange a meeting at which the caller would rendezvous with UC-2 in or near Richmond, Virginia. The caller cautioned UC-2 about talking too much during phone calls. The caller and UC-2 referred to the cocaine as truck parts during their conversations. Based on my training and experience, I know that individuals involved in the illegal trafficking of drugs commonly use coded language, refer to illegal drugs in terms of legal commerce, and minimize details during phone conversations in order to avoid detection by law enforcement.

[2] That phone number, a date of birth, addresses, and driver's license number referenced below are known to your Affiant in their entirety. However, in keeping with Fed. R. Crim. P. 49.1 and the local rules of this District, and out of respect for **MARQUEZ's** privacy, they are referred to generally herein.

13. The investigative team checked law enforcement and public databases and learned that the 4931 phone number was serviced by AT&T and associated with **MARQUEZ**. AT&T records responsive to an administrative subpoena reflected that "Angel Marquez" was the listed subscriber for the 4931 phone number with an address in the Atlanta metropolitan area. A search of public records revealed that Angel Emilio Marquez, born on a particular date in 1969, was associated with that same address.

14. The investigation team located a Facebook account with the name "Angel Emilio Marquez" as the username. After searching this Facebook account, investigators found a posted business flyer for "MARQUEZ TRANSPORT" with the 4931 phone number printed across the bottom of the flyer. This flyer was posted on November 9, 2026.

15. Investigators also identified a Georgia driver's license number ending in 5983 as being registered to an Angel Emilio Marquez at a different address in the Atlanta metropolitan area. The photo associated with that driver's license appeared to depict the same individual depicted in photos on the Facebook account referenced above. Additionally, the 4931 phone number was listed as the contact number associated with **MARQUEZ's** Georgia driver's license.

16. On November 2, 2026, Chesterfield County Police Detective J.T. Godsey sought and obtained a search warrant from the Hon. M. Duncan Minton, Jr. of the Chesterfield County Circuit Court for real-time location data associated with the telephone using the 4931 phone number.

17. On November 3, 2026, that search warrant was served on AT&T. The investigative team monitored the court ordered real-time location data and determined that the

device associated with the 4931 phone number was in the vicinity of the **MARQUEZ's** address on file with the Georgia Department of Motor Vehicles.

18. On November 13, 2026, **MARQUEZ** rendezvoused with UC-2 at a prearranged location in Chesterfield County, Virginia, within the Eastern District of Virginia.

19. **MARQUEZ** told UC-2 that **MARQUEZ** was very careful and has a lot of buyers in New Jersey and Boston. **MARQUEZ** explained that he wanted to purchase "1" or "2" from UC-2 but did not have the money with him. **MARQUEZ** explained that he planned to take 2 to sell in New Jersey and wanted UC-2 to sell each kilogram for $13,000. UC-2 agreed and attempted to provide him with harmless, lookalike substances—colloquially referred to as "sham" drugs—that the DEA had packaged prior to the deal, but **MARQUEZ** did not wish to take possession and said that his friend (who had a secret compartment in his vehicle) was coming to meet him in five hours to pick it up.

20. UC-2 left the scene, and **MARQUEZ** was arrested by DEA agents and task force officers. **MARQUEZ** was in possession of the **TARGET DEVICE** when he was taken into custody, and it was seized incident to his arrest.

21. Based on my training and experience, I am aware that the quantity of cocaine that **MARQUEZ** attempted to purchase is inconsistent with personal use. Based on my training and experience, I am further aware that drug traffickers utilize couriers who operate commercial trucks and frequently travel throughout the country to transport narcotics and narcotics proceeds.

22. The **TARGET DEVICE** is currently in storage at 9200 Public Works Road, Chesterfield, VA 23832. In my training and experience, I know that the **TARGET DEVICE** has been stored in a manner in which its contents are, to the extent material to this investigation, in

substantially the same state as they were when the **TARGET DEVICE** first came into the possession of the DEA.

**USE OF CELLULAR TELEPHONES, COMPUTERS, STORAGE MEDIA, AND <u>ELECTRONIC DEVICES BY DRUG DISTRIBUTORS</u>**

23. Based on my training and experience, knowledge, participation in narcotics investigations, I know that drug traffickers use computers, cell phones, other electronic devices, and online accounts in furtherance of drug trafficking, and I am familiar with the methods used by individuals involved in the distribution of narcotics and money laundering. In particular I know that:

a. Drug traffickers commonly use computers, cellular telephones, and other electronic devices to communicate with other drug traffickers and customers about drug-related activities through the use of telephone calls, text messages, email, chat rooms, social media, and other internet- and application-based communication forums. Moreover, drug traffickers commonly use other capabilities of computers and electronic devices to further their drug trafficking and money laundering activities. Electronic devices, including cellular phones, can also be utilized to access, conduct transactions, and communicate using digital wallet applications like CashApp and Venmo and encrypted messaging applications like WhatsApp, Signal, and Telegram. Your Affiant has reason to believe that cellular telephones were used to commit the drug trafficking offense described herein, and therefore those electronic devices constitute instrumentalities of the criminal activity.

b. Illicit narcotic transaction requires a distributor, controlled substances, a client, communication, a transaction location, and something of value, which is usually U.S. currency or cryptocurrency. In the modern era of narcotics distribution, “open-air drug markets”

have been mostly replaced by technological devices, and traditional paper ledgers have been replaced by those of electronic means. This is particularly true in the context drug transactions conducted via phones and other electronics and crimes involving cryptocurrency, which inherently necessitates electronic means.

c. Drug traffickers frequently use cellular telephones and other electronic devices to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular location at which they might be subject to physical surveillance by law enforcement authorities. Narcotics traffickers rarely refer to fentanyl or other illegal drugs expressly by name. Instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, narcotics traffickers routinely refer to drugs, drug quantities, and drug prices by using seemingly innocuous words or phrases. I have become familiar the methods, language, and terms that narcotics traffickers use to disguise conversations about their narcotics activities.

d. Drug traffickers frequently have access to several devices, and that they periodically use newly acquired devices, all in an effort to avoid detection and to impede law enforcement efforts. Drug traffickers also communicate by use of text messaging and electronic messaging applications to discuss types, quantities, and prices of narcotics, as well as to discuss meeting locations, all in an effort to elude detection and to impede the efforts of law enforcement. Drug dealing is an ongoing process that requires the development, use, and protection of a communications network to facilitate daily narcotics distribution. Drug traffickers commonly keep their old cell phones. It is common for law enforcement to seize numerous old cell phones during the execution of a search warrant at a drug trafficker's residence.

e. Drug traffickers commonly make and maintain business records. Specifically, it is quite common for those involved in the manufacture, sale, purchase, and transportation of controlled substances to generate and maintain writings, books, records, receipts, notes, ledgers, lists, airline tickets, money orders, package and shipping labels, and other memoranda to assist in their criminal activities. These materials are created and maintained in much the same way and for the same reasons as persons involved in legitimate businesses. Drug traffickers maintain records to know the current status of the various illegal transactions in which they are involved. Without the aid of such records, drug traffickers would face a high possibility of error and mistake due to the number, complexity, and frequency of their transactions, and the clandestine nature of drug trafficking activities. Such records are often maintained on electronic devices and accounts utilized by drug traffickers.

f. Drug traffickers commonly maintain addresses or telephone numbers in electronic accounts, which reflect the names, addresses, and/or telephone numbers of their associates in drug trafficking. They also store such information, as well as photographs, messages, and personal notes, in electronic equipment including, but not limited to, computers, cellular phones, and other electronic software, mediums, and accounts. Drug traffickers often take photographs and/or videotapes of themselves, their associates, their property, and evidence of their drug trafficking. These materials are usually maintained in their possessions, including on electronic accounts.

g. Traffickers and money launderers who use electronics to arrange drug transactions often utilize multiple electronic accounts to conduct their business and add additional layers of anonymity in their distribution schemes. This may include one or more form of cryptocurrency, cryptocurrency exchanges, and accounts at financial institutions. Records of

account activity and financial transactions can be located in email accounts associated with financial institutions and cryptocurrency exchanges.

h. Drug traffickers utilize numerous locations to further their criminal activities. Distributors who mail narcotics often utilize multiple USPS post offices and/or blue boxes to “drop” drug-laden packages. This is done in an effort to evade detection of the individual or individuals behind the distribution scheme. Information found on electronic devices may assist investigators in identifying the drug trafficker's residence, stash house, coconspirators, the residences of the trafficker's coconspirators, meeting locations, and postal facilities utilized.

## TECHNICAL TERMS

24. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. *Wireless telephone*: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional “land line” telephones. A wireless telephone usually contains a “call log,” which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic “address books;” sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones

may also include global positioning system ("GPS") technology for determining the location of the device.

b. *Digital camera*: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting

the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. *Tablet*: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. *IP Address*: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

25. Based on my training and experience, I know that the **TARGET DEVICE** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA**.** In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the **TARGET DEVICE**. This information can sometimes be recovered with forensics tools.

27. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET DEVICE** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **TARGET DEVICE** because:

i. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

j. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

k. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

l. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

m. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **TARGET DEVICE** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **TARGET DEVICE** to human inspection in order to determine whether it is evidence described by the warrant.

29. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**CONCLUSION**

I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **TARGET DEVICE** described in Attachment A to seek and seize the items described in Attachment B.

Respectfully submitted,

______________________________
Matthew Taylor
Special Agent, Drug Enforcement Administration

Sworn and subscribed to me in accordance with Fed. R. Crim. P. 4.1 by telephone this 14th day of November 2026.

/s/ MRC
______________________________
Honorable Mark R. Colombell
United States Magistrate Judge

## ATTACHMENT A

**Property to be Searched**

The property to be searched is an Apple iPhone with a black and blue case and cracked screen, hereinafter the "**TARGET DEVICE**." The **TARGET DEVICE** is currently located at 9200 Public Works Road, Chesterfield, VA 23832. It is depicted below:



This warrant authorizes the forensic examination of the **TARGET DEVICE** for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

## Particular Things to be Seized

The items to be seized are evidence, in whatever form and however stored, in relation to violations of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B)(ii)(II) (conspiracy to distribute cocaine and attempted possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine), involving ANGEL EMILIO MARQUEZ from April 2026 through the present, including, but not limited to:

a. Incoming/outgoing/missed phone call log(s);

b. SMS/MMS messages and other communications and notes;

c. Voicemail messages;

d. Telephone contact lists;

e. Records relating to the use of and accumulation of proceeds derived from the sale of cocaine or any other illegal controlled substances, as well as the acquisition of property obtained from drug proceeds, and items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money obtained from drug sales, including records of large purchases, receipts, canceled checks, bank records, credit card records, wire transfers, wire transfer receipts, cashier's checks, cashier's check receipts, addressed mail, express delivery receipts/envelopes, utility company receipts, rent receipts, income tax returns, money drafts, money orders, and their receipts;

f. Financial records including expenses incurred in obtaining the equipment and items necessary for the transportation and/or distribution of controlled substances, income derived from the sales of controlled substances, as well as records of legitimate income or lack thereof, and general living expenses;

g. Records, correspondence, narcotic customers list, narcotic supplier lists, ledgers, logs, journals, accounts payable and receivable, pay-owe sheets, contracts, letters and memoranda of agreements between potential coconspirators, formulas, receipts, phone records, phone books, address books, notations and other papers, and any files relating to the transporting, ordering, purchasing, or distributing of controlled substances;

h. Records related to the rental and/or ownership of safe deposit box keys, storage locker keys, safes, and related secure storage devices;

i. Images in all forms, to include video and photographs, and all platforms, including

applications, that reference or include the order, shipment, receipt, tracking, purchase, distribution or possession of controlled substances;

j. Images in all forms to include video and photographs, in particular images showing the association of co-conspirators, of assets, and of controlled substances;

k. Any physical or digital record, including but not limited to application and document data, that includes information pertaining to location information or location data;

l. All notes, application data, or other digital files, to include financial transfers and payments related to the order, shipment, receipt, tracking, purchase, distribution or possession of controlled substances;

m. Evidence of who used, owned, or controlled the **TARGET DEVICE** at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

n. Evidence indicating how and when the **TARGET DEVICE** was accessed or used to determine the chronological context of computer access, use, and events relating to crimes under investigation and to the **TARGET DEVICE** user;

o. Evidence indicating the **TARGET DEVICE** user's state of mind as it relates to the crimes under investigation;

p. Evidence of the attachment to the **TARGET DEVICE** of other storage devices or similar containers for electronic evidence;

q. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the **TARGET DEVICE**;

r. Passwords, encryption keys, and other access devices that may be necessary to access the **TARGET DEVICE**;

s. Records of or information about Internet Protocol addresses used by the **TARGET DEVICE**;

t. Records of or information about the **TARGET DEVICE's** Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

As used above, the terms “records” and “information” include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.